UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

EDWARD BENDER,

                    Plaintiff,

v.                                              2:03CV519 and
                                                2:04CV300

CARLOS M. GUTIERREZ, in his
official capacity as U.S.
Secretary of Commerce,

and

PATRICIA A. KURKUL, in her
official capacity as Regional
Administrator for National
Oceanic and Atmospheric
Administration, National Marine
Fisheries Service,

                    Defendants.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

        This matter is before the Court on defendants' motion for summary judgment and plaintiff's cross motion for summary judgment. The motions were referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72 of the United States District Court for the Eastern District of Virginia, by order of reference entered March 28, 2006. The Court has original jurisdiction in this action pursuant to 28 U.S.C. § 1331.

## I.  STATEMENT OF THE CASE

        Plaintiff challenges two administrative rules that the National Marine Fisheries Service (The NMFS) of the National Oceanic and Atmospheric Administration (NOAA), promulgated pursuant to the Endangered

Species Act (ESA), 16 U.S.C. §§ 1531-1544.  The rules purportedly conserve threatened species of sea turtles by restricting pound net fishing in the lower Chesapeake Bay.

### A.  Background

The ESA is comprehensive legislation for preservation of endangered species, with the aim of halting and reversing the trend towards species extinction.  See Tennessee Valley Authority v. Hill, 437 U.S. 153, 174, 180, 184 (1978).  The legislative history of the ESA expresses "concern over the risk that might lie in the loss of any endangered species."  Id. at 177.

The Chesapeake Bay (hereinafter "the Bay") contains many Loggerhead, Kemp's Ridley, Green and Leatherback sea turtles, which are listed under the ESA as threatened and endangered species.  See 2003 AR 1722, 1731; 2004 AR 2050, 2066-2067.  Each spring, the Sea Turtle Stranding and Salvage Network has consistently documented elevated strandings in the Virginia portion of the Bay, particularly during the second half of May through June.  2004 AR 279-282.  From 1995 to 2002, between the months of May through June, the number of reported strandings more than doubled, with 84 in 1995, and increasing to 180 in 2002.  Id.; 2004 AR 209-211.  In 2003, data indicated that 312 turtles were stranded in Virginia between May and June.  Id.; 2004 AR 209-211.  The majority of the turtles stranded are Loggerheads, but Kemp's Ridley, Green, and Leatherback sea turtles have also been stranded.  Id.

While investigating the potential causes of the strandings, The NMFS conducted a systematic survey of seventy active pound nets in the Bay from April 25, 2002, to June 1, 2002.  2004 AR. 1103.  Active

pound nets were monitored again from April 21, 2003, to June 11, 2003. Id.

During the course of the investigation by the NMFS, it was documented that one cause of mortality of threatened and endangered sea turtles in the Bay was entanglement or impingement in pound net leaders. Id. For example, in 2002, four dead sea turtles were found entangled in pound nets, and two were found impinged. Id. In 2003, seventeen turtles were found in pound net leaders with stretched mesh measuring less than twelve inches, of which five turtles were found entangled (three dead and two alive), and twelve were found impinged or held against pound nets by the current (one dead and eleven alive). Id.

It is possible that the turtles documented only represent a minimum record of entangled or impinged turtles, since turtles entangled more than a few feet below the surface are more difficult to observe, due to poor water clarity in the Bay. 2004 AR 1104. While the NMFS has no empirical data to ascribe all of the stranded turtle deaths to the pound net fishing industry, they have concluded that pound net leaders are a contributing factor. Id.

On June 17, 2002, the NMFS issued an interim final rule (hereinafter "2002 Rule"), prohibiting the use of string leaders and pound nets with mesh stretched greater than twelve inches from May 8 thru June 30. The 2002 Rule also established a framework mechanism by which changes could be made to the restrictions or their effective dates, or both, on an expedited basis to protect sea turtles, if turtles were found dead or alive in pound nets. Specifically, the mechanism stated that from

> May 8 to June 30 of each year, if the NMFS
> receives information that one sea turtle is
> entangled alive or that one sea turtle is
> entangled dead, and the NMFS determines that the
> entanglement contributed to its death, in pound
> net leaders that are in compliance with the
> restrictions . . . the AA may issue a final rule
> modifying the restrictions on pound net leaders as
> necessary to protect threatened sea turtles. . . .
> In addition, if information indicates that a
> significant level of sea turtle strandings will
> likely continue beyond June 30, the AA may issue a
> final rule extending the effective date of the
> restrictions, including any additional
> restrictions imposed under this subparagraph, for
> an additional 30 days, but not beyond July 30, to
> protect threatened sea turtles.

2004 AR 113; Vol. 67 Fed. Reg. No. 116 at 41204 (June 17, 2002).

The mechanism was triggered during the 2003 season, when monitoring between May 8 and June 11, 2003, revealed five turtles entangled in pound net leaders, three of which were found dead attributable to entanglement. 2003 AR 1986-1987. Consequently, on July 16, 2003, the NMFS published a temporary final rule in the Federal Register (hereinafter "2003 Rule"), pursuant to the 2002 framework mechanism prohibiting all pound nets in the Bay from July 16 through July 30, 2003. 2004 AR 157.

On February 6, 2004, after observing the entanglements and impingements in the spring of 2002 and 2003, the NMFS issued a proposed rule that would replace the 2003 Rule. 2004 AR 1102-1109. A public hearing was held in Virginia Beach and an open comment period on the proposed rule ended on March 8, 2004. Id. On May 5, 2004, the NMFS issued the 2004 final rule (hereinafter "2004 Rule"), which is at issue in this case. 2004 AR 2221-2236.

On April 17, 2006, the NMFS issued a proposed rule that would partially rescind the total prohibition on pound nets from May to June, and it would allow modified pound nets that met specifications listed in the regulations.  Fed. Reg. Vol. 71 No. 73 at 19675-19681 (April 17, 2006).  On June 23, 2006, following a full notice and comment period, the NMFS issued a final rule that _inter alia_ allows for the use of modified pound net leaders and retains the framework mechanism contained in the previous regulations.  71 Fed. Reg. No. 121 at 36024-36033 (June 23, 2006)(codified at 50 CFR §§ 222, 223).

## B.  Procedural History

On July 16, 2003, plaintiff filed his initial complaint (2:03cv519), alleging that the 2003 Rule was arbitrary, capricious, an abuse of discretion, or contrary to law.  (Compl. at 2.)  Plaintiff further alleged that the 2003 Rule was enacted without observance of procedure required by law, in that he and other fishermen were not provided notice of the pendency of the 2003 Rule until two days before it became effective.  (Compl. at 5-6.)

Because the complaint stated "[t]his is an action for Temporary Restraining Order" the Court, in consideration of plaintiff's status as a _pro se_ litigant, construed the complaint as seeking injunctive relief, including a motion for a temporary restraining order, and denied the motion for a temporary restraining order.  (Doc. 3, Op. and Ord at 1.)  After denying the motion for a temporary restraining order, the only issue remaining was what the Court construed as a complaint seeking injunctive relief.

On July 18, 2003, plaintiff appealed the denial of the restraining order to the United States Court of Appeals for the Fourth Circuit. On July 24, 2003, plaintiff filed, in this Court, a motion for reconsideration and summary judgment. On July 29, 2003, the Court denied the motion and stayed the motion for summary judgment, pending the Fourth Circuit's decision on the appeal. (Doc 7, Ord.)  On January 28, 2004, the Fourth Circuit dismissed plaintiff's appeal for lack of jurisdiction. On March 10, 2004, the District Court, on remand, denied the pending motion for summary judgment.  (Doc. 14, Ord.)

On February 6, 2004, the NMFS issued a proposed rule in the Federal Register altering the restrictions on pound net fishing.  2004 AR 1102-1109.  On February 12, 2004, plaintiff filed a motion to amend his complaint, seeking declaratory judgment rather than injunctive relief.  The Court deferred a finding on the motion, pending the enactment of the 2004 Rule, because the rule would have eliminated the framework mechanism at issue possibly rendering plaintiff's case moot. (Doc. 17, Ord.)

On May 5, 2004, the NMFS issued a final rule that contained the framework mechanism.  See 2004 AR 2221-2236.  On May 14, 2004, the Court found that because of the inclusion of the framework mechanism in the 2004 Rule, it was reasonable to expect that plaintiff would be subject to other actions, and therefore, the claims are not moot. (Doc. 18, Ord.)

The Court granted plaintiff leave to amend on two bases: (1) the 2003 Rule should be set aside pursuant to 5 U.S.C. § 706(2)(A) as arbitrary and capricious, because it was based on insufficient data; and

(2) that the use of a "framework mechanism" by the NMFS to reimpose restrictions on pound net fishing beyond their expiration dates should be set aside pursuant to 5 U.S.C. § 706(2)(D), because it was not in observance of the procedure required by 5 U.S.C. § 553.  Id.

On May 28, 2004 plaintiff filed an amended complaint, alleging that the issuance of the 2003 Rule was in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), as arbitrary and capricious, or otherwise not in accordance with law, because it was based on insufficient data.  Further, the amended complaint alleged that the issuance of the 2003 Rule was in violation of 5 U.S.C. § 706(2)(D), because the NMFS lacked jurisdiction to use the "framework mechanism" to reimpose restrictions on pound net fishing after the expiration of June 30, 2003.  (Amended Compl. ¶¶ 8, 9.)

On May 7, 2004, plaintiff filed a motion for temporary injunction and declaratory relief under the same caption and case number as his previous challenges, this time challenging the 2004 Rule.  The Court directed the Clerk to file the motion as a new civil action (2:04cv300), noting that the motion challenged a regulation which was not in effect at the time plaintiff initially filed his complaint (2:03cv519).  (Doc. 18, Ord.)

The motion for temporary injunction and declaratory relief asserts that: (1) the NMFS lacked jurisdiction to issue regulations for the protection of listed sea turtles in the Bay; (2) the NMFS did not rely on the best available science when it issued the 2004 Rule; (3) the NMFS did not have good cause to waive the thirty-day waiting period pursuant to 5 U.S.C. § 553(d)(3);(4) the agency should have allowed for

notice and comment on the framework provision; (5) the 2003 Rule deprived him of the economically viable use and enjoyment of his property and is unconstitutional under the Takings Clause of the Fifth Amendment; and (6) the NMFS discriminated by not including plaintiff in an experiment to test leader modification. (Mot. for Temp. Inj. and Decl. Judg. at 6-12.)

On July, 19, 2004, defendants moved to dismiss plaintiff's amended complaint (2:03cv519), or in the alternative consolidate the case with plaintiff's motion for temporary injunction and declaratory relief (2:04cv300). By Order of October 26, 2004, the cases were consolidated.

On January 6, 2006, defendants moved for summary judgment, pursuant to Rule 56(c), Federal Rules of Civil Procedure, maintaining that: (1) plaintiff's challenge to the 2003 Rule is moot;(2) despite the fact that the 2003 Rule is moot, the 2003 and subsequent 2004 Rules are reasonable; and (3) the Court lacks jurisdiction to entertain plaintiff's Fifth Amendment claim. (Mem. in Support of Def. Mot. for Summ. J.) This matter is now ripe for consideration.

## **B. Issues**

The issues in this case are as follows:

1.   Is plaintiff's challenge to the 2003 rule moot?

2.   Has plaintiff established that the 2003 and 2004 Rules are arbitrary, capricious, and unreasonable, and therefore unconstitutional?

3.   Does the Court have jurisdiction to entertain plaintiff's Fifth Amendment claim?

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  Motion for Summary Judgment Standard

As set forth in Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party can show by affidavits, depositions, admissions, answers to interrogatories, the pleadings, or other evidence, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56 mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party is not entitled to summary judgment if there is a genuine issue of material fact in dispute.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of fact exists if a reasonable jury could return a verdict for a nonmoving party.  See id.  In other words, summary judgment appropriately lies only if there can be but one reasonable conclusion as to the verdict.  See id.

Finally, as the Fourth Circuit explained,

> [W]e must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion.  Summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, such as where the non-moving party has failed to make a sufficient showing on an essential element of the case that the non-moving party has the burden to prove.

Tuck v. Henkel Corp., 973 F.2d 371, 374 (4th Cir. 1992)(citations omitted).

### B. Plaintiff's Challenges to the 2003 & 2004 Rules are MOOT

"In general a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Murphy v. Hunt, 455 U.S. 478, 481 (1982). However, an exception applies. Where the alleged harm, though not presently being suffered by the complainant is "capable of repetition, yet evading review," a case is not moot. Id. at 482. This exception applies where: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party will be subjected to the same action again." Weinstein v. Bradford, 423 U.S. 147, 149 (1975).

In this case, plaintiff challenges the invocation of the framework mechanism, not the framework provision itself. Since the mechanism in the 2002 Rule, used to promulgate the 2003 Rule, is no longer in effect, any opinion on the application of the mechanism in the 2002 Rule would arguably be merely an advisory opinion. The 2006 Rule, currently in effect, also contains the framework mechanism. The mechanism in the 2006 Rule has not been triggered, and likewise the mechanism in the 2004 Rule was never triggered. Therefore, there is no live controversy regarding the application of the framework mechanism, since the 2003 Rule incorporating the challenged application of the framework mechanism is no longer in effect.

However, this case is "capable of repetition yet evading review." Under the 2002 framework mechanism, the NMFS imposed restrictions on the use of pound net leaders for an additional time period from July 16 to July 30. This leaves plaintiff with only fifteen days to litigate his case, which is clearly not long enough for any challenge to be litigated before the rule's expiration on July 30. As the Court stated, it is reasonable to expect that plaintiff will be subjected to the same action again because the NMFS has decided to keep the mechanism in both the 2004 and 2006 Rules. (Doc. 17, Ord.) Therefore, plaintiff's challenge is not moot.

1.  <u>The 2003 Rule is Reasonable</u>

a.  <u>Extension of restrictions beyond June 16, 2003</u>

While plaintiff's challenge to the 2003 Rule is not moot, the Rule is reasonable, and plaintiff's challenge to the Rule is without merit. The mechanism in the 2002 Rule was triggered between May 8 and June 11, 2003, by the entanglement and death of a sea turtle in a pound net leader. Additionally, the administrative record documents other qualifying turtle entanglements between May 8 and June 30, 2003. <u>See</u> 2003 AR 1922-27; 2003 AR 1931-35; 2003 AR 1950-57; 2003 AR 1986-87; 2003 AR 1989-90. The 2003 Rule was subsequently filed on July 16, 2003, extending pound net prohibitions through July 30, 2003.

Plaintiff asserts that the NMFS was required to immediately file a rule when the mechanism was triggered. Plaintiff is troubled that the 2003 Rule was enacted more than thirty days after the triggering event, the discovery of a dead turtle on May 11, 2003. Plaintiff also asserts that since no dead turtles were found between June 12 and July

11

16, 2003, the decision to extend the prohibition was based upon insufficient evidence.

Plaintiff believes that since the 2003 Rule expired on June 30, 2003 and no extension had yet been made extending the Rule, that the NMFS was not acting in accordance with the mechanism and accordingly had no authority when it enacted the 2003 Rule on July 16, 2003, extending the prohibitions through July 30, 2003. It is plaintiff's contention that the NMFS had to use its emergency rule making authority since the Rule was issued after June 30, 2003, the date the rule was set to expire.

Under the ESA, endangered and threatened species are afforded the highest priority. See Hill, 437 U.S. at 174. The language referred to by plaintiff requiring the immediate filing of an extension is contained in the preamble to the 2003 Rule and not within the Rule itself. The preamble to the Rule is used to decipher the Rule when the Rule itself is ambiguous. See Udall v. Tallman, 380 U.S. 1, 16 (1965) ("a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.")

In this case, the 2003 Rule is not ambiguous. It plainly states "if information indicates that a significant level of sea turtle strandings will likely continue beyond June 30, the AA may issue a final rule extending the effective date of the restrictions . . . for an additional 30 days, but not beyond July 30." 2003 AR 1829. Nothing in the language suggests that any extension must be issued before June 30. Accordingly, since the immediately filed language is not contained in the regulation itself and the language of the regulation itself is not

ambiguous, the preamble language is not authoritative.  Clearly all that is necessary is that the triggering event occur before June 30.

Plaintiff appears to devalue the life of a single turtle, completely contrary to the goal of the ESA, which places a higher value on the lives of every threatened or endangered species of sea turtle than it does those species not considered endangered or threatened.

The decision to issue further restrictions was made on July 9, 2003, and on July 16, 2003, the 2003 Rule was issued.  2003 AR 1950.  All of the conditions were clearly met to trigger the mechanism.  No matter how minor plaintiff believes them to be, the decision to trigger the mechanism was based on sufficient evidence because of the priority afforded to endangered and/or threatened species.  There was also no delay from the time a decision was made by the NMFS to extend restrictions to the date the restrictions were issued and became effective.

Plaintiff incorrectly reads the language of the mechanism to believe that any extension of the 2003 Rule triggered by the mechanism needed to be enacted before June 30, otherwise the NMFS had to use it's emergency rule making authority.  Once again, the language regarding emergency rule making authority is in the preamble to the Rule and states that the NMFS would use emergency rule making authority under the ESA at other times of the year after July 30, not after June 30.  2003 AR 1822. Nowhere in the mechanism is there language to support plaintiff's interpretation that emergency rule making procedures must be used for rules issued before July 30.

b.  <u>Waiver of the thirty-day notice period</u>

According to 5 U.S.C. § 553(d)(3), "publication or service of a substantive rule shall be made not less than 30 days before its effective date, except . . . as otherwise provided by the agency for good cause found and published with the rule."  Plaintiff believes that the NMFS did not have good cause to waive the thirty-day waiting period when it published the 2003 Rule on July 16, 2003.  However, the NMFS properly invoked the "good cause" exception under the APA because turtles were present in the Bay and subject to entanglement and impingement in pound net leaders.  2003 AR 1987.

"[A]n agency should 'balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling.'" <u>Omnipoint Corp. v. F.C.C</u>, 78 F.3d 620, 630 (D.C. Cir.)(quoting <u>United States v. Gavrilovic</u>, 551 F.2d 1099, 1105 (8th Cir.1977).  Since, endangered and threatened species are afforded the highest priority, only one dead turtle will trigger the framework mechanism during the prescribed time period, and address the risk of future turtle interaction with pound nets.  <u>See</u> <u>Hill</u>, 437 U.S. at 174.  The fact that the 2002 Rule also contained the mechanism that provided for the extension of the prohibition until July 30, put fishermen on notice that such an action was a distinct possibility in the future.

The administrative record reveals that turtles were found entangled or stranded between May 8 and June 30, as needed to trigger the mechanism, and this was clearly stated as support for bypassing the

thirty-day waiting period when the 2003 Rule was published.   2003 AR
1987.   After a decision was made to extend the Rule pursuant to the
mechanism in order to prevent the likelihood of even one more turtle
interaction with pound nets, it was necessary for the Rule to be
effective without delay.   Because the NMFS knew the Rule would become
effective upon its publication, they went above and beyond the necessary
steps to notify fishermen by sending letters to individual fishermen and
running commercial radio announcements.   See 2003 AR 1976, 1978-1980,
1981-1984.

The extension of the prohibition against pound nets was not
simply created by the NMFS out of thin air.   The framework mechanism had
been in place for almost a year, thus, fishermen had more than a
reasonable amount of time to prepare for a possible triggering event.
Given the information before them, the NMFS reasonably found "good cause"
to waive the thirty-day waiting period in order to prevent the death of
more turtles.

2.   The 2004 Rule is reasonable

a.   The NMFS has jurisdiction and authority to issue regulations
for the protection of sea turtles

Plaintiff challenges the jurisdiction and/or authority of the
NMFS to regulate pound net leaders in the Bay for the protection of sea
turtles.   The ESA prohibits private persons from taking endangered or
threatened species without a permit or exemption that allows for the
taking.   Plaintiff contends that an "intent" to take turtles is a
required element for a violation under the ESA, and since no fisherman

intends to take turtles with the pound nets, the NMFS cannot prosecute a fisherman for violation of the ESA for taking turtles.

Despite plaintiff's use of the terms interchangeably, Congress and the courts have clearly provided that the Secretary of Commerce, which has authority over the NOAA and the NMFS, has both jurisdiction and authority to issue regulations to protect sea turtles.  For more than thirty years the Secretary of Commerce has had jurisdiction over sea turtles in the marine environment.  Appendix to Title 5 U.S.C., Reorganization Plan No. 4 of 1970, 35 Fed. Reg. 15627, 84 Stat 2090 (eff. Oct. 3, 1970).  The ESA permits the Secretary of Commerce to promulgate protective regulations for the benefit of threatened or endangered turtles.  See State of Louisianna, ex rel. Guste v. Verity, 853 F.2d 322 (5th Cir. 1989).  The ESA provides that, "[w]henever any species is listed as a threatened species . . . the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."  16 U.S.C. § 1533(d).

Section 9 of the ESA addresses endangered species specifically, by stating that "it is unlawful for any person subject to the jurisdiction of the United States to . . . take any such [endangered] species within the United States."  16 U.S.C. § 1538(a)(1)(B).  The term 'take' is clearly defined in Section 3, as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct."  ESA § 3(19), 16 U.S.C. § 1532(19).

The Supreme Court has noted that both intentional and unintentional or incidental "takes" are encompassed in the prohibition on "takes," and the actor's intent is not relevant.  Babbitt v. Sweet

16

<u>Home</u>, 515 U.S. 687, 703-705 (1995).   Furthermore, the Secretary of Commerce has defined "incidental take" as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity."   50 C.F.R. § 402.02.

Regarding threatened species, the ESA states that the appropriate "Secretary may by regulation prohibit with respect to any threatened species any act prohibited under [ESA § 9] in the case of fish and wildlife."   ESA § 4(d); 16 U.S.C. § 1533(d).   This allows the Secretary of Commerce to extend the "take" prohibitions regarding endangered species to threatened species.   Accordingly, the NMFS has jurisdiction and authority to issue regulations for the protection of sea turtles.

b.   <u>The use of scientific data by the NMFS</u>

Plaintiff also argues that the NMFS did not rely on the best available scientific evidence when it issued the 2004 Rule.   In support of this position, plaintiff points out that Dr. Jack Musik, of the Virginia Institute of Marine Science, opposes pound net prohibitions. While Musik may be a leading expert in the field of sea turtle conservation, he is not the only authority, and his opinion, in and of itself, is not binding on the NMFS.   In deciding

> whether an agency decision was "arbitrary or capricious," the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one."

<u>Marsh v. Oregon Nat'l Resources Council</u>, 490 U.S. 360, 378 (1989).

Many of the commenters who opposed the proposed pound net closure did so because they do not consider pound net leaders the "primary" cause of sea turtle strandings. <u>See</u> 2004 AR 2221, 2225. The NMFS does not contend that pound net interaction is the primary cause or even a substantial cause of sea turtle strandings. <u>Id.</u> However, the NMFS has sufficiently documented that pound net leaders contribute to some, but not all, of the strandings of sea turtles in the Bay. <u>Id</u>; 2004 AR 286-290, 322-342; 2003 AR 1538-1599.

"When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." <u>Marsh</u>, 490 U.S. at 378. While the death of a single turtle may not seem sufficient to warrant the prohibition established by the rule at issue, endangered and threatened species are afforded the highest priority under the ESA in order to ensure their survival.

The mechanism provides a low threshold, whereby the entanglement of a single turtle and the prospects of continued interaction with pound nets is all it takes to trigger continued restrictions through the end of July. The Court finds no error in judgment by the NMFS because the administrative record is replete with support to justify the actions taken by the NMFS in issuing the Rule. The mere lack of unanimous support from the scientific community is not enough to invalidate the decision of the NMFS. Accordingly, the NMFS did not violate the "arbitrary and capricious" standard under the APA, 5 U.S.C. § 706(2)(A).

c.  <u>Waiver of thirty-day notice requirement</u>

As with the 2003 Rule, plaintiff claims that the NMFS did not have good cause to waive the thirty-day notice requirement before its effective date pursuant to 5 U.S.C. § 553.  The 2004 Rule was published on May 5, 2004, and became effective on May 6, 2004.  The agency again invoked the "good cause" exception because during the thirty-day delay period, turtles were likely subject to entanglement and impingement in pound net leaders and mortality.  2004 AR 2234.

Due to their protected status, in order to attempt to prevent any harm to turtles, the NMFS reasonably concluded "good cause" existed to waive the thirty-day notice requirement.  During that time of year, sea turtles are more prominent in the Bay and subject to entanglement, as demonstrated throughout the administrative record.  The 2004 Rule was practically identical to previous versions of the Rule, thereby, fishermen could have reasonably expected similar rules to become effective in the future.  In addition, written notice was provided to fishermen on April 30, 2004, including plaintiff.  Accordingly, the Court finds that the NMFS properly invoked the "good cause" exception when it issued the 2004 Rule.

d.  Addition of framework mechanism to 2004 Rule

On February 26, 2004, the NMFS published the proposed 2004 Rule but did not include the framework mechanism.  The 2004 Rule was issued on May 5, 2006, and included the framework mechanism.  Plaintiff contests the addition of the mechanism to the 2004 Rule because the NMFS did not allow notice and comment with respect to the framework mechanism specifically.

19

Under the APA an agency is required to publish a general notice of proposed rule making in the Federal Register.  <u>See</u> 5 U.S.C. § 553.  Since the framework mechanism was not included in the proposed rule, fisherman were not allowed the opportunity to comment on its potential inclusion in the final rule.  The mechanism was included to allow the agency to respond to potentially new information regarding the interaction of sea turtles and pound nets and to ensure the protection of sea turtles, should monitoring reveal the entanglement of a live or dead turtle.

While the provision was not included in the proposed rule, the failure is not fatal to the ultimate validity of the rule.  The APA "does not require an agency to publish in advance every precise proposal which it may ultimately adopt as a rule."  <u>Daniel Intern. Corp. v. Occupational Safety and Health</u>, 656 F.2d 925, 932 (4th Cir. 1981)(citing <u>Spartan Broadcasting Co. v. F.C.C.</u>, 619 F.2d 314, 321 (4th Cir. 1981)).  The APA only requires an agency to publish the "terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).  A final rule need not be identical to the original proposed rule.  <u>See</u> <u>American Federation of Labor and Cong. of Indus. Orgs. v. Donovan</u>, 757 F.2d 330, 338 (D.C. Cir. 1985).  "A proposed rule . . . must fairly apprise interested parties of the scope and substance of a substantially revised final rule, and under this approach, a substantial change must relate in part to the comments received."  <u>Chocolate Mfrs. Ass'n. of U.S. v. Block</u>, 755 F.2d 1098, 1105 (4th Cir.1985).

The Fourth Circuit has adopted the "logical outgrowth" test of other circuits.  Under the "logical outgrowth" test "notice is adequate if the changes in the original plan 'are in character with the original scheme,' and the final rule is a 'logical outgrowth' of the notice and comments already given." Id.; See, e.g., BASF Wyandotte Corp. v. Costle, 598 F.2d 637, 642 (1st Cir.1979);South Terminal Corp. v. EPA, 504 F.2d 646, 659 (1st Cir.1974); Sierra Club v.Costle, 657 F.2d 298, 352 (D.C. Cir. 1981)(logical outgrowth of the notice and comments); Taylor Diving & Salvage Co. v. Dept. of Labor, 599 F.2d 622, 626 (5th Cir.1979)(logical outgrowth of the standard originally proposed).  Under this test, notice is adequate as long as the final rule does not "materially alter the issues involved in the rule making . . . [or] substantially depart[] from the terms or substance of the proposed rule." Brock, 755 F.2d at 1105.

The addition of the framework mechanism to the 2004 Rule is clearly a logical outgrowth because it is a carry over from the 2002 Rule, which was updated and replaced by the 2004 Rule.  The NMFS included the emergency framework mechanism in order to balance the less stringent measures of the Rule in the event that endangered or threatened turtles were found impinged or entangled by pound net leaders in compliance with the final rule.  See 2004 AR 1806-1812.  Furthermore, the addition of the framework mechanism was related, and in part responsive to, comments received during the notice period.  Specifically, some commenters requested the "status quo" option, which included the framework provision.  2004 AR 2224, 225 (comments 6 & 7).  The framework mechanism is clearly a logical outgrowth, and its addition to the final rule does

not materially alter or substantially depart from the substance of the proposed rule.

e.   Fifth Amendment "takings"

Plaintiff also makes equal protection claims, alleging that the rules at issue and plaintiff's exclusion from a pound net study conducted by the NMFS have deprived him of his "economically viable use and enjoyment of property and is unconstitutional" under the Fifth Amendment.  (Pl. Mot. for Temp. Inj. and Declaratory. J. at 8-9.)

Equal protection claims come in three forms: (1) claims asserting the singling out of members of a vulnerable group for unequal treatment; (2) challenges to laws or policies alleged to make irrational distinctions; and (3) claims that an individual has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 440-41 (1985); Lindsey v. Normet, 405 U.S. 56, 74-79 (1972); Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  Plaintiff appears to be asserting the third type of equal protection claim under a "class of one" theory.  However, equal protection claims under a  "class of one" theory turn on whether the state has exhibited spiteful, vindictive behavior toward the claimant and whether there is any rational basis for the difference in treatment. Olech, 528 U.S. at 564.

Plaintiff is upset because the NMFS excluded him from its pound net study because he had enforcement actions pending.  However, plaintiff's exclusion was not done in retaliation for the present litigation, as plaintiff would like the Court to believe.  Instead,

plaintiff was excluded because of unresolved administrative matters pending before the agency at the time the study was taking place. Plaintiff has failed to demonstrate in any credible manner that the actions of the NMFS in issuing the challenged regulations were vindictive or spiteful.  He has also provided no case law in support of his position that he constitutes a "class of one."  Therefore, plaintiff's Fifth Amendment "taking" claims are without merit.

### III.   RECOMMENDATION

For the foregoing reasons, the Court recommends that defendants' motion for summary judgment be GRANTED and plaintiff's cross-motion for summary judgment be DENIED.

### IV.   REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three days permitted by Rule 6(e) of said rules.

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based

on such findings and recommendations.  See Thomas v. Arn, 474 U.S. 140

(1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v.

Schronce, 727 F.2d 91 (4th Cir. 1984).


                                    _____/s/_____
                                    James E. Bradberry
                                    United States Magistrate Judge

Norfolk, Virginia

    September 19   , 2006


24

<u>Clerk's Mailing Certificate</u>

A copy of the foregoing Report was mailed this date to each of the following:

Edward H. Bender, <u>pro se</u>
23104 Pineview Road
P.O. Box 2050
Cheriton, VA  23316

George M. Kelley, III, Esq.
U.S. Attorney's Office
101 W. Main St., Ste. 8000

Mary M. Whittle, Esq.
U.S. Dept. of Justice
P.O. Box 7369
Washington, DC  20044-7369

Meredith L. Flax, Esq.
U.S. Dept. of Justice
P.O. Box 7369
Washington, DC  20044-7369

Fernando Galindo, Acting Clerk

By _____
                    Deputy Clerk

_____, 2006